IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| TONY SPEIGHT and FELICE CUNNINGHAM, Individually and As Parents and Natural Guardians of D.M.C., a Minor | : : : : : | |
| Plaintiffs, | : : | CIVIL ACTION NO. 1:11-CV-03163-AT |
| v. | : : | |
| CORPORAL BENJAMIN W. GRIGGS, and FULTON COUNTY, GEORGIA, | : : : | |
| Defendants. | : | |

## **ORDER**

This action arises from injuries Plaintiffs' teenage son, D.M.C., sustained when Defendant Fulton County Police Officer Corporal Benjamin W. Griggs ("Officer Griggs" or "Defendant Griggs") shot him during an attempted arrest.[1]  It is now before the Court on Defendant Griggs' Motion for Summary Judgment [Doc. 59], Fulton County's Motion for Summary Judgment[2] [Docs. 60, 89], and Plaintiff's Cross-Motion for Partial Summary Judgment [Doc. 73].  The Court's rulings are set forth below.

---

[1] Although Plaintiffs have submitted no such evidence in the summary judgment record, Plaintiffs contend that "D.M.C. suffered extensive brain damage from the shooting and has no recollection of the events of that night." (Pls.' Cross-Mot. for Partial Summ. J. at 13, n.2.)

[2] The docket reflects two motions filed by Fulton County, Docs. 60 and 89.  However, the second motion filed at Doc. 89 is identical to the first motion, Doc. 60, except that it is redacted consistent with the Court's Order on the parties' motion to seal.  (*See* Order at Doc. 87.) Accordingly, the first motion at Doc. 60 is **DENIED AS MOOT**.

## I.    BACKGROUND[3]

On the evening of July 28, 2011, D.M.C.[4] went joyriding with a friend, Jontavious Darden, in a stolen vehicle given to Darden by a junkie from their neighborhood.  (Fulton Cnty. SMF ¶ 1; Pls.' Resp. SMF ¶ 1; Darden Dep. 12:20-13:19, 39:18-40:3, 41:9-20, 52:10-13.)  Darden drove the vehicle, a Honda Accord, while D.M.C. rode in the front passenger seat.[5]  (Fulton Cnty. SMF ¶ 2; Pls.' Resp. SMF ¶ 2; Darden Dep.  12:16-19, 16:3-8.)    Darden and D.M.C. drove from Avondale Estates to Union City because they were bored and there was nothing else to do and decided to go see "Faye" whom D.M.C. referred to as his sister. (Fulton Cnty. SMF ¶ 4; Pls.' Resp. SMF ¶ 4; 13:20-14:7, 42:12-25.)  At some point in the evening after visiting Faye's house, Darden noticed a police officer patrolling the area, panicked, and pulled into a Chevron gas station located on Flat Shoals Road.  (Fulton Cnty. SMF ¶ 5; Pls.' Resp. SMF ¶ 5; Darden Dep. 10:1-21, 13:25-15:20.)

Fulton County Police Officer Michael Guin was conducting a "business check" of the Chevron station when he observed Darden and D.M.C. in the Honda Accord and noticed that they matched the description of two individuals involved in a possible incident reported earlier at the Chevron.  (Guin Dep. 56:18-57:19, 62:21-63:3.)  Officer Guin parked behind the Honda Accord and ran the tag from

---

[3] Defendant Griggs failed to respond to Plaintiff's Cross-Motion for Partial Summary Judgment. Accordingly, Plaintiff's Statement of Material Facts, [Doc. 73-2], are deemed admitted, unless otherwise contradicted by the record evidence.
[4] D.M.C. was 16 years old at the time of the incident.  (Griggs Dep. 51:14-16.)
[5] Darden testified that they offered a ride to a third young man, but that he did not know this individual's name. (Fulton Cnty. SMF ¶ 3; Pl.'s Resp. SMF ¶ 3; Darden Dep. 9:16-10:2, 12:2-15, 40:21-41:8.)  This unknown male rode in the rear passenger seat.  (Darden Dep. 12:17-19.)

the computer in his patrol car.  (Guin Dep. 58:12-59:3, 62:9-12.)  The vehicle had been reported stolen two months earlier.  (Pls.' Add'l SMF ¶ 2; Fulton Cnty.'s Resp. to Pls.' Add'l SMF ¶ 2; Guin Dep. Ex. 1, at 2.)  Officer Guin notified "communications" of his location and that he had an occupied stolen vehicle.  (Guin Dep. 66:10-14; Guin Dep. Ex. 1, at 2.)

Officer Guin approached the driver's side door of the Honda Accord "in a felony stop manner" with his gun drawn in a low, ready position.  (Fulton Cnty. SMF ¶¶ 14-15; Pls.' Resp. SMF ¶¶ 14-15; Guin Dep. 63:4-10, 67:5-7, 74:13-75:25; Guin Dep. Ex. 1, at 2.)  Officer Guin then issued a verbal command to the occupants to keep their hands visible.  (Fulton Cnty. SMF ¶ 16; Pls.' Resp. SMF ¶ 16; Guin Dep. 77:12-19; Guin Dep. Ex. 1, at 2.)  When Officer Guin opened the driver's side door, Darden took his foot off the brake to exit the vehicle and it began to roll backwards toward Guin's patrol car.  (Fulton Cnty. SMF ¶ 18; Pls.' Resp. SMF ¶ 18; Guin Dep. 80:23-81:11; Guin Dep. Ex. 1, at 2.)  To stop the vehicle, Officer Guin reached in behind Darden and pulled the emergency brake located in between the front driver's seat and passenger seat.  (Fulton Cnty. SMF ¶ 19; Pls.' Resp. SMF ¶ 19; Guin Dep. 81:11-17; Guin Dep. Ex. 1, at 2.)  During this commotion, D.M.C., who was in the front passenger seat, took the opportunity to exit the vehicle and flee the scene on foot, running in the direction of an adjacent Motel 6.  (Fulton Cnty. SMF ¶ 20; Pls.' Resp. SMF ¶ 20; Guin Dep. 81:18-25.)  Darden made no attempt to pursue D.M.C. and instead focused his efforts on

detaining Darden.  (Pls.' Add'l SMF ¶ 4; Fulton Cnty.'s Resp. to Pls.' Add'l SMF ¶ 4; Guin Dep. 83:15-84:17.)

Officer Guin holstered his gun, pulled Darden out of the vehicle, and placed one handcuff on Darden's right wrist.  (Fulton Cnty. SMF ¶ 21; Pls.' Resp. SMF ¶ 21; Guin Dep. 82:1-13, 88:20-89:3; Guin Dep. Ex. 1, at 2.)  Darden refused to comply with Officer Guin's request that he place his left hand behind his back and actively resisted Officer Guin's attempt to place the handcuff on his left wrist. (Guin Dep. 82:11-83:14, 84:17-86:3, 86:20-88:17; Guin Dep. Ex. 1, at 2-3.) Officer Guin keyed up his shoulder microphone to request that dispatch order responding units to step up their response.   (Guin Dep. 82:21-83:14.)  During the struggle, Darden was able to turn his body toward Guin and a "push-and-shove match" ensued. (Guin Dep. 84:20-24; Guin Dep. Ex. 1, at 3.)

In order to regain control, Officer Guin drew his ASP expandable baton and struck Darden once in the upper right forearm and once on the lower calf region.  (Guin Dep. 84:24-86:25; Guin Dep. Ex. 1, at 3.)  Officer Guin was unable to deliver strong blows with the baton because of his close proximity to Darden and the vehicle, and Darden broke free of Officer's Guin's grasp.   (Guin Dep. 85:7-87:22; Guin Dep. Ex. 1, at 3.)  Darden lunged toward Officer Guin, briefly reached for the baton, and then swung at Officer Guin with his right arm and the handcuff brushed Officer Guin across the face.   (Guin Dep. 86:25-90:7; Guin Dep. Ex. 1, at 3.)  At that point, Officer Guin drew his gun and Darden took off running in the direction of the Motel 6.  (Guin Dep. 88:16-90:25; Guin Dep. Ex. 1,

at 3.)   Guin gave a brief chase after Darden, radioed dispatch to provide the location of the subject and a clothing description, and decided to wait for the responding officers to arrive and set up a perimeter. (Guin Dep. 91:10-92:3.)

Several officers who heard Officer Guin's radio call for backup during the struggle with Darden began arriving on the scene, including Defendant Griggs and Detective Marty McHugh.   (Guin Dep. 113:12-22; McHugh Dep. 11:4-12:25; Griggs Dep. 208:10-210:25, 212:2-213:18.)   At approximately 12:40 a.m., Officer Corey Henry of the K-9 unit of the Fulton County Sheriff's Department also responded with a search dog, "Marco."   (Guin Dep. Ex. 1, at 3; Henry Dep. 9:4-13:9, 17:14-19:16, 45:8-10.)   Officer Guin provided a description of the suspect and informed the officers what had happened, including that the driver of the stolen vehicle had assaulted him before fleeing the scene on foot.[6]   (Guin Dep. 113:12-25; McHenry Dep. 11:25-12:25; Henry Dep. 9:4-13:9, 17:14-19:16, 12:25-13:5, 17:20-23; Griggs Dep. 138:11-13; Griggs Dep. Ex. 2, at 2.)   Defendant Griggs and Detective McHugh volunteered to search the woods for the suspect with Officer Henry and the K-9 "Marco."   (Fulton Cnty. SMF ¶¶ 31-32; Pls.' Resp. SMF ¶¶ 31-32; Griggs Dep. 215:25-216:12; Griggs Dep. Ex. 2, at 3.)

The officers followed the K-9 "Marco" into the woodline as he tracked the scent of the suspect through a fence separating the Chevron and the Motel 6.

---

[6] Officer Henry testified that he was only aware of a description of the driver and was not aware that there was a passenger who had fled the scene before the altercation with Officer Guin. (Henry Dep. 44:15-25.)   Detective McHugh overheard Officer Guin mention that the passenger had fled the scene during his struggle with the driver and that both individuals had run in the direction of the Motel 6.   (McHugh Dep. 17:21-18:16.)

(Griggs Dep. 218:11-219:4; Griggs Dep. Ex. 2, at 3; McHugh Dep. 18:10-16.) Defendant Griggs followed Officer Henry and the K-9 to the left toward some abandoned houses or structures behind the motel, and Detective McHugh fanned out in the opposite direction.   (McHugh Dep. 20:12-24:20; Griggs Dep. 218:11-220:20.)   The search area behind the Motel 6 was thickly wooded and dark requiring the officers to use flashlights and night vision units for visibility. (Griggs Dep. 124:8-24, 134:7-135:12, 136:2-4, 216:13-24; Griggs Dep. Ex. 2, at 3; Henry Dep. 9:20-10:5, 20:18-21:1, 23:1-24, 45:1-46:8; McHugh Dep. 35:1-19, 52:5-18.)  Shortly after crossing the fence line, Detective McHugh and Defendant Griggs heard the dog begin to bark and Officer Henry yell commands to someone to "get down" and "let me see your hands."[7]   (McHugh Dep. 24:22-26:16; McHugh Dep. Ex. 1, at 1; McHugh Dep. Ex. 2, at 1;  Griggs Dep. 221-13; Griggs Dep. Ex. 2, at 4.)   At that point, Defendant Griggs was unable to see the individual subject because his view was obstructed by a large tree.[8]  (Griggs Dep. 221:6-13; Griggs Dep. Ex. 2, at 4.)   Officer Henry heard the suspect say, "Okay, okay, I give" as he began to step out from behind the tree.   (Henry Dep. 18:16-18; Henry Dep. Ex. 3, at 1.)  He could only see the suspect's silhouette because it was dark.  (Henry Dep. 20:21-21:5.)  Officer Henry stopped Marco from charging the suspect and maintained a distance of approximately 15 yards from the suspect

---

[7] Officer Henry testified that he did not instruct the suspect to get on his knees, but that the suspect did that on his own.   (Henry Dep. 47:21-23.)   However, Detective McHugh and Defendant Griggs both testified that they heard Officer Henry issuing verbal commands to the suspect.  (McHugh Dep. 24:22-26:16; McHugh Dep. Ex. 1, at 1; McHugh Dep. Ex. 2, at 1;  Griggs Dep. 221-13; Griggs Dep. Ex. 2, at 4.)

[8] Detective McHugh testified that when he saw the suspect he was sitting on the ground behind a tree.  (McHugh Dep. 30:12-31:24.)

after which he observed the suspect step out from behind a tree and start to get down on his knees.  (Henry Dep. 18:16-22; Henry Dep. Ex. 3, at 1.)

Defendant Griggs rushed over toward Officer Henry and the K-9, and as he came around the tree he also observed a black male – now known to be D.M.C. – step out from behind a tree and start to slowly go down on one knee with his hands out in front of him.  (Griggs Dep. 221:14-25; Griggs Dep. Ex. 2, at 4.) Because it was dark, Defendant Griggs illuminated the suspect with the tactical light on his gun and began issuing verbal commands to "get on the ground." (Griggs Dep. 124:8-25, 221:20-25.)  At that time, he could only see the suspect's left hand but not his right hand.   (Griggs Dep. 132:22-133:2, 221:22-23.) Defendant Griggs instructed Officer Henry that he was going to "go hands on"[9] and needed a light because he was turning off the tactical light and holstering his gun to handcuff the suspect.  (Griggs Dep. 133:8-14, 222:5-223:12, 228:5-17; Griggs Dep. Ex. 2, at 4.)  Defendant Griggs testified that it was his plan to put the gun up, kneel on the suspect, and then handcuff him.  (Griggs Dep. 135:15-28, 223:11-12, 228:13-229:24.)

According to Defendant Griggs, because the suspect "was not getting on the ground," had only "gone to one knee," and was acting "like he was unsure of what he was going to do," Defendant Griggs – in one continuous motion – moved in

---

[9] "Going hands on" means that the officer is going to place handcuffs on the suspect.  (Griggs Dep. 133:22-23.)

and push-kicked[10] the suspect with his right leg, knocking him to the ground.[11] (Griggs Dep. 133:2-14, 137:17-138:3, 221:22-223:25; Griggs Dep. Ex. 2, at 4.) When he performed the "push-kick," Defendant Griggs was holding the gun with the tactical light in operation. (Griggs Dep. 222:3-223:25, 227:12-229:24; Griggs Dep. Ex. 2, at 4-5.) After seeing which direction the suspect had fallen, Defendant Griggs took his hand off the gun as he moved in toward the suspect, causing the tactical light to go out. (Griggs Dep. 132:2-10, 135:12-14, 228:18-229:17; Griggs Dep. Ex. 2 at 4-5.) Defendant Griggs remembers that he encountered the suspect sooner than he anticipated and still had the gun out. (Griggs Dep. 135:15-136:7, 222:6-9, 223:13-25; Griggs Dep. Ex. 2, at 4-5.) Through the course of trying to holster his gun, preparing to kneel down on the suspect, and pulling out his handcuffs, Defendant Griggs' gun went off, shooting D.M.C. through one of his hands[12] and in the back of the head. (Griggs Dep. 136:2-137:10, 222:3-224:3, 231:13-232:1, 241:3-241:22; Griggs Dep. Ex. 2, at 4-5.) Griggs heard the shot, but did not see what had happened. (Griggs Dep. 229:8-18, 241:19-22; Griggs Dep. Ex. 2, at 5.) Griggs testified that after hearing the

[10] Defendant Griggs testified that a "push-kick" is "just a push-kick forward. I didn't rear back and kick him. I just pushed him over with my foot." (Griggs Dep. 180:6-24.)
[11] Officer Henry's incident report and deposition testimony indicate that after he saw the suspect "starting to get down on his knees [he] then observed Officer Griggs run over to him and push him down to the ground," followed by the sound of a single gunshot. (Henry Dep. 18:21-24; Henry Dep. Ex. 3, at 1.) Officer Henry later testified "[a]nd then, and then he started to get down – he got down on his knees." (Henry Dep. 47:19-20, 48:2-17.) Officer Henry also testified that he saw the suspect put his right hand up, but did not see him place his hands behind his head. (Henry Dep. 37:16-38:1, 47:7-13.)
[12] Griggs testified that he saw the injury to D.M.C.'s head but later learned that the bullet also went through D.M.C.'s hand, although he didn't recall seeing that on the night of the shooting. Griggs also could not explain whether D.M.C. had his hands placed behind his head at the time of the shooting. (Griggs Dep. 241:3-241:22; Griggs Dep. Ex. 2 at 5.)

shot, he turned his light back on and shined it in the direction of the suspect and saw that D.M.C. had sustained an injury to his head.  (Griggs Dep. 241:3-241:22; Griggs Dep. Ex. 2, at 5.)   At that point, Griggs said "Oh, God I shot him.  I AD'd,"[13] and got on his radio to request an ambulance and emergency EMS personnel.  (Griggs Dep. 231:4-12; Griggs Dep. Ex. 2, at 5.)  He then knelt down beside D.M.C., checked for a pulse and started talking to him saying "please hang in there, I'm sorry, I'm so sorry, please hang in, stay with me."[14]   (Griggs Dep. 233:14-25.)  Griggs testified that he was distraught over the incident, that the gun accidentally discharged, and that he did not intend to shoot D.M.C.  (Griggs Dep. 17:3-14, 122:17-123:10, 125:3-8, 231:4-12, 233:14-25, 207:4-208:5, 264:3-21.)

Defendant Griggs was trained as an officer to index the weapon, i.e., meaning that an officer does not put his finger on the trigger or inside the trigger housing/guard of the gun unless the officer intends to shoot.  (Griggs Dep. 115:21-23, 121:3-16, 206:25-207:6.)   In terms of whether he violated any training protocols on the night of the incident, Griggs testified that "obviously [his] finger wasn't indexed" as his training required, because his finger must have been on the trigger when the gun discharged.[15]  (Griggs Dep. 117:14-118:6, 122:17-123:10, 125:3-8, 206:18-22.)

---

[13] AD is the term officers use to refer to an accidental discharge. (Griggs Dep. 30:1-16.)
[14] There is a tape of Detective Griggs' reaction to the shooting, his numerous radio calls for emergency medical services, and his statements to D.M.C. following the incident.  (Griggs Dep. 233:14-24.)
[15] Defendant Griggs testified that he was not aware that his finger was on the gun's trigger until he heard the shot.  (Griggs Dep. 117:14-20.)

Griggs further testified that his actions in having his gun drawn during the search and in "taking [D.M.C] down" were not unreasonable under the circumstances because he had been informed that the suspect he was looking for had assaulted another police officer before fleeing the scene and that D.M.C. was not fully and promptly complying with their commands to get down on the ground.   (Griggs Dep. 86:8-13, 207:19-208:4, 216:25-217:7.)   He testified, however, that it was not a "deadly-force situation," there was no reason to shoot D.M.C., and that he did not intend to shoot him.   (Griggs Dep. 133:24-134:6, 207:4-208:5.)   Defendant Griggs further testified that D.M.C. was not immediately complying with the officers' numerous commands to get on the ground, but that he was not actively resisting arrest.   (Griggs Dep. 262:21-263:15.)

Following the incident, Defendant Griggs was placed on paid administrative leave for a period of time and was temporarily restricted from participating in SWAT call-outs.   (Griggs Dep. 18:118.)   Defendant Griggs went before the Fulton County Response to Resistance Review Board as a result of the accidental discharge of his gun.   (Griggs Dep. 102:14-103:19.)   The Review Board recommended that Defendant Griggs receive additional firearm training.   (Griggs Dep. 104:13-19.)   Defendant Griggs received additional training in September 2011 on the use of force in low lighting situations, preventing unintentional/accidental discharges, and the use of flashlights and tactical gun-mounted lights.   (Griggs Dep. 104:23-116:25, 119:20-121:7, 121:24-127:9, 128:18-

131:20; Nable Dep. 35:3-14, 61:20-63:1, 96:10-22.)   Prior to this incident, Defendant Griggs had not received specific training in the context of preventing accidental or unintentional discharges during the course of an arrest.   (Griggs Dep. 126:25-127:5, 128:20-129:23.)   His previous training was geared toward judgmental/intentional shooting.  (Griggs Dep. 127:6-9, 129:16-17.)

The Fulton County Police Department requires all officers to complete a minimum of eleven (11) weeks of Georgia Peace Officer's Standard and Training Council ("P.O.S.T.") mandate training and to receive P.O.S.T. certification. (Fulton Cnty. SMF ¶ 48; Pls.' Resp. SMF ¶ 48; Stiles 2nd Aff. ¶ 5.)  Fulton County Police Officers receive mandated training on peace officer liability, firearms, and use of force, which includes lessons as to restraint and how to use the appropriate level of force when conducting an arrest.   (Fulton Cnty. SMF ¶ 49; Pls.' Resp. SMF ¶ 49; Stiles 2nd Aff. ¶ 6.)   The Fulton County Police Department also requires all officers to complete at least forty (40) hours of in-service training annually, twice the number of hours required to maintain P.O.S.T. certification, and conducts Roll-Call Training at various precincts, which provides a regular method for updating the skills, knowledge and abilities of sworn personnel between formal training sessions.  (Fulton Cnty. SMF ¶¶ 50-51; Pls.' Resp. SMF ¶¶ 50-51; Stiles 2nd Aff. ¶¶ 7-8.)  The Fulton County Police Department conducts training audits throughout the year to track officer training to determine whether additional training is required.   (Fulton Cnty. SMF ¶¶ 53-54; Pls.' Resp. SMF ¶¶ 53-54; Stiles 2nd Aff. ¶ 9.)  In addition to training officers to index their weapon,

the Fulton County Police Department trains its officers to avoid going "hands-on" with arrestees/detainees while their firearms are drawn.  (Fulton Cnty. SMF ¶¶ 58-59; Stiles 1st Aff. ¶¶ 4-5.)  Officers are trained to holster their weapons when they lay hands on a suspect to make an arrest.  (Fulton Cnty. SMF ¶ 60; Stiles 1st Aff. ¶ 5.)

## II.   STANDARD OF REVIEW ON SUMMARY JUDGMENT

The Court must grant summary judgment if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual issue is material if resolving the factual issue might change the suit's outcome under the governing law.  *Id.*  The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party. *Id.* at 249.   Still, as Judge Murphy noted, "[s]ummary judgment is a lethal weapon, and courts must be mindful of its aims and targets and beware of overkill in its use."  *Patterson v. Fuller*, 654 F. Supp. 418, 420 (N.D. Ga. 1987) (citing *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 612 (5th Cir. 1967)).

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  The moving party need not positively

disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the moving party meets this initial burden, in order to survive summary judgment, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial.  *Id.* at 324-26.  The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.

### III.   ANALYSIS

Plaintiffs' Complaint, as amended, asserts the following claims:  (1) a constitutional claim for unlawful use of excessive and deadly force in violation of the Fourth Amendment against Defendant Griggs; (2) a constitutional claim for defective customs and policies and failure to train against Fulton County pursuant to *Monell v. Dep't of Soc. Servs. of NY*, 436 U.S. 558 (1978); and (3) state law claims for negligence and battery against Defendant Griggs.  (*See* Compl., Doc. 1; 1st Am. Compl., Doc. 47; 2nd Am. Compl., Doc. 66.)

Defendant Griggs seeks summary judgment on Plaintiffs' constitutional claim on the grounds that (1) the shooting of D.M.C. was unintentional and therefore cannot serve as the basis of a Fourth Amendment violation, and (2) he is entitled to qualified immunity because (a) there was arguable probable cause to pursue D.M.C. with his gun drawn, and (b) his actions and non-deadly use of

force were reasonable under the circumstances.  In addition, Defendant Griggs seeks summary judgment on Plaintiffs' state law claims based on official immunity because there is no evidence that he acted with malice in accidentally shooting D.M.C.

Plaintiffs also seek summary judgment against Defendant Griggs asserting that (1) they are entitled to judgment as a matter of law on the Fourth Amendment claim because Defendant Griggs admits he intentionally used force that was not justified under the circumstances, and (2) they are entitled to judgment as a matter of law on their state law negligence claim because Defendant Griggs admits that he placed his finger on the trigger of his gun when he had no discretion to deviate from an absolute ministerial duty not to do so.

Finally, Fulton County seeks summary judgment on Plaintiff's *Monell* claims because (1) Plaintiffs failed to identify any relevant policy or custom of Fulton County that caused D.M.C.'s injury, and (2) Plaintiffs failed to demonstrate that Fulton County was on notice of a need for additional training to prevent similar accidental shootings or was aware of a pattern or practice of similar violations.

### A.  Plaintiffs' Fourth Amendment Claim Against Defendant Griggs[16]

#### 1.  Excessive Force and the Fourth Amendment

The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the right to be free from the use of excessive force in the course of an arrest, or other "seizure."[17]  *See Graham v. Connor*, 490 U.S. 386, 394-95 (1989); *Mercado v. City of Orlando*, 407 F.3d 1152, 1156-57 (11th Cir. 2005); *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004); *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002) (the unreasonable use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment).  A claim of excessive force is analyzed through the lens of the Fourth Amendment's "objective reasonableness" standard.[18] *Graham*, 490 U.S. at 395-96 (citing *Tennessee v. Garner*, 471 U.S. 1

---

[16] As an initial matter, to determine whether Defendant Griggs is entitled to judgment as a matter of law on Plaintiffs' excessive/deadly force claim, the Court must accept Plaintiffs' version of the facts and draw all justifiable inferences in their favor.  *Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011) (citing *Pourmoghani–Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010) (per curiam)); *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002).  However, because the victim in this action has no recollection of the incident, the Court must necessarily rely on the facts presented by the Defendants and the witnesses, but where there is a discrepancy between the evidence, the Court will resolve the dispute by using only those statements most favorable to the Plaintiffs.  *See McCullough v. Antolini*, 559 F.3d 1201, 1202 (11th Cir. 2009).

[17] Under the Fourth Amendment, a seizure occurs when an officer exerts intentional or willful control "by means of physical force or show of authority" to restrain the liberty of a citizen.  *See Brower v. Cnty. of Inyo*, 489 U.S. 593, 595 (1989); *Terry v. Ohio*, 392 U.S. 1, 19 n. 16 (1968).

[18] Under the Supreme Court's pronouncement in *Graham,* the Fourth Amendment's "'reasonableness'" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.  An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."  *Graham*, 490 U.S. at 397 (citations omitted) (stating that a subjective concept like "malice" has no place in the Fourth Amendment's "objective reasonableness" inquiry).  "Of

(1985)); *McCullough v. Antolini*, 559 F.3d 1201, 1205-06 (11th Cir. 2009); *Crenshaw v. Lister*, 556 F.3d 1283, 1290 (11th Cir. 2009). "In order to determine whether the amount of force used by a police officer was proper, a court must ask 'whether a reasonable officer would believe that this level of force is necessary in the situation at hand.'" *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) (quoting *Willingham v. Loughnan*, 261 F.3d 1178, 1188 (11th Cir. 2001)); *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002) ("The question is whether the officer's conduct is objectively reasonable in light of the facts confronting the officer."). The reasonableness of a particular use of force must be judged on a case-by-case basis "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396; *Long v. Slaton*, 508 F.3d 576, 580 (11th Cir. 2007); *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993) (same).

The Supreme Court has cautioned that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments –in circumstances that are tense, uncertain, and rapidly evolving –about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. Thus, "[i]n making an excessive force inquiry, [courts] are not to view the matter as judges from the comfort and safety of

course, in assessing the credibility of an officer's account of the circumstances that prompted the use of force, a factfinder may consider, along with other factors, evidence that the officer may have harbored ill-will toward the citizen. Similarly, the officer's objective "good faith"—that is, whether he could reasonably have believed that the force used did not violate the Fourth Amendment—may be relevant to the availability of the qualified immunity defense to monetary liability under § 1983." *Graham,* 490 U.S. at 399, n.12 (citations omitted).

[their] chambers," rather the courts must view "the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal." *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1333 (11th Cir. 2004) (citing *Graham*, 490 U.S. at 396-97; *Kesinger*, 381 F.3d at 1248-50 (11th Cir. 2004); *Garrett v. Athens–Clarke Cnty.*, 378 F.3d 1274, 1279 (11th Cir. 2004)). Moreover, the determination of whether the particular use of force is reasonable under the Fourth Amendment "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Garner*, 471 U.S. at 9); *see also Fils v. City of Aventura*, 647 F.3d 1272, 1288 (11th Cir. 2011).

The Supreme Court and the Eleventh Circuit have recognized that "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396 (citation omitted); *Lee*, 284 F.3d at 1197; *McCullough*, 559 F.3d at 1206. "Indeed, the typical arrest involves some force and injury, and the use of force is an expected, necessary part of a law enforcement officer[']s task of subduing and securing individuals suspected of committing crimes." *Lee*, 284 F.3d at 1198 (citations and quotations omitted); *Rodriguez*, 280 F.3d at 1351; *see also Nolin v. Isbell*, 207 F.3d 1253, 1257-58 (11th Cir. 2000).

> [I]n order to balance the necessity of using some force attendant to an arrest against the arrestee's constitutional rights, a court must evaluate a number of factors, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."

*Lee*, 284 F.3d at 1197-98 (quoting *Graham*, 490 U.S. at 396).  Thus, "the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by [1] the severity of the crime, [2] the danger to the officer, and [3] the risk of flight." *Id.*

Obviously, "using deadly force in a situation that clearly would not justify its use is unreasonable under the Fourth Amendment."  *Mercado v. City of Orlando*, 407 F.3d 1152, 1160 (11th Cir. 2005).  Thus, the Eleventh Circuit has distilled from the Supreme Court's decision in *Tennessee v. Garner* three key factors concerning the reasonableness of the use of deadly force.  *Terrell v. Smith*, 668 F.3d 1244, 1251 (11th Cir. 2012) (citing *Garner*, 471 U.S. at 11-12 and *Vaughan v. Cox*, 343 F.3d 1323, 1329–30 (11th Cir. 2003)).  Under *Garner*, an officer is justified in using deadly force to stop a fleeing felony suspect when the officer:

> (1) "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others" or "that he has committed a crime involving the infliction or threatened infliction of serious physical harm;" (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible.

*Vaughan,* 343 F.3d at 1329-30 (quoting *Garner*, 471 U.S. at 11-12); *Terrell*, 668 F.3d at 1251.   Although this list of factors may be relevant in assessing the reasonableness of using deadly force, the Supreme Court has cautioned that "*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.'" *Scott v. Harris*, 550 U.S. 372, 382 (2007).   As the Eleventh Circuit has explained, "[t]he constitutional test for excessive force is necessarily fact specific," *McCullough*, 559 F.3d at 1206, and the courts must "slosh [their] way through the factbound morass of 'reasonableness.'" *Long*, 508 F.3d at 580 (quoting *Scott v. Harris*, 550 U.S. at 383).

### 2.  *Excessive Force and Accidental Shootings*

The Eleventh Circuit has not decided whether or in what circumstances the purely accidental discharge of a firearm implicates the Fourth Amendment. However, a handful of federal courts[19] have addressed the issue whether an unintentional shooting caused by an accidental discharge can serve as the basis for a Fourth Amendment violation resulting from the use of unreasonable excessive and/or deadly force.   These courts *generally* follow two distinct lines of reasoning: *first*, that an accidental discharge/shooting does not constitute a Fourth Amendment violation because the officer's unintentional conduct is

---

[19] The Court's discussion, *infra*, is not meant to include an exhaustive list of cases addressing accidental shootings in the context of a Fourth Amendment excessive force claim.

insufficient to effect an actionable seizure,[20] and *second*, that an accidental shooting during the course of an arrest may constitute a Fourth Amendment violation if the officer's conduct preceding the accidental weapon discharge is unreasonable under the circumstances.[21] *Compare Brice v. City of York*, 528 F. Supp. 2d 504, 510 (M.D. Pa. 2007) ("Negligent, accidental, or unintentional conduct that has the coincidental effect of producing a seizure will not substantiate an excessive force claim."), *and Owl v. Robertson*, 79 F. Supp. 2d 1104, 1114 (D. Neb. 2000) (reasoning "if the shooting was truly accidental, then there was no violation of [plaintiff's] Fourth Amendment rights since the act of drawing the weapon and the act of forcing [plaintiff] to the ground were not . . . excessive under the Fourth Amendment . . . This is because the Fourth Amendment protects citizens against willful shootings and not accidental, but otherwise reasonable, ones."), *with Sorensen v. McLaughlin,* No. 09-2842, 2011 WL 1990143, at *4-6 (D. Minn. 2011) ("Where a shooting [whether alleged to be accidental or intentional] occurs, an inquiry into reasonableness requires scrutiny of the conduct leading up to the shooting."), *and Johnson v. City of Milwaukee*, 41 F. Supp. 2d 917, 929 (E.D. Wis. 1999) ("In emphasizing the accidental nature of the shooting defendants focus too narrowly on the end result

---

[20] Many of these cases apply a narrower construction of the Supreme Court's holding in *Brower v. Cnty. of Inyo*, that a Fourth Amendment "seizure" requires an intentional act by a governmental actor and that "the Fourth Amendment addresses 'misuse of power,' . . . not the accidental effects of otherwise lawful government conduct." 489 U.S. 593, 596-97 (1989).

[21] For the most part, these cases tend to follow a broad construction of the Supreme Court's holding in *Tennessee v. Garner* that "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." 471 U.S. 1, 5 (1985).

of the alleged conduct. . . . A firearm does not discharge in a vacuum. The critical question is how the shooting came about. If the cause of the shooting was prior police conduct that was unreasonable under the Fourth Amendment, the accident is compensable.").

Although the Eleventh Circuit has not addressed the precise issue presented by the facts of this case, in *Vaughan v. Cox*, the Court did address whether an officer's intent to shoot a suspect during a car chase implicated the Fourth Amendment.  343 F.3d 1323 (11th Cir. 2003).  In *Vaughan*, the Eleventh Circuit analyzed whether the plaintiff was subjected to a "seizure" within the meaning of the Fourth Amendment when he was shot by an officer who intentionally fired his gun at the vehicle in an attempt to stop it, but did not intend to shoot the plaintiff who was a passenger inside the vehicle.  *Id.* at 1327-1329.

The relevant facts in *Vaughan* are as follows:  The Coweta County Sheriff's Department received a report of a stolen truck, including a description of the suspected thief, traveling along Interstate 85 south of Atlanta.  *Id.* at 1325-26. Two deputies were dispatched to search for the stolen truck.  *Id.* at 1326.  After spotting a truck matching the description, the deputies hatched a plan to stop the vehicle and arrest the suspect.  *Id.*  While tracking the truck, one of the deputies made efforts to determine whether it was indeed the stolen vehicle.  *Id.*  He observed two men in the truck's cab and the plaintiff, who was riding in the passenger seat, matched the description of the suspect.  *Id.*  The deputy

unsuccessfully attempted a "rolling roadblock" in an attempt to stop the truck, causing a collision between the deputy's cruiser and the truck.  The driver of the truck did not pull over, but instead accelerated.  The deputy repositioned his cruiser, unholstered his weapon, rolled down the passenger side window, and readied himself in case the truck's driver made aggressive moves in his direction. *Id.*  After he pulled alongside the truck and turned on his rooftop lights, the driver accelerated in an attempt to flee.    *Id.* at 1327.  The deputy then fired three rounds into the truck without warning, hitting the plaintiff, puncturing his spine, and paralyzing him.  *Id.*  The deputy's plan had been to disable either the truck or the driver so that he could force the truck off the road.  *Id.*  However, a high-speed chase ensued, the deputy made several more attempts stop the vehicle, and ultimately the chase ended after the truck's driver lost control, jack-knifed and collided with a cement median.  *Id.*

The district court concluded that the plaintiff, Vaughan, was not subjected to a "seizure" within the meaning of the Fourth Amendment, reasoning that the defendant intended to fire his shots at the driver of the truck and the truck itself, but did not intend to fire at Vaughan.  *Id.* at 1327, 1328.  In assessing the plaintiff's excessive force claim, the Eleventh Circuit in *Vaughan* looked first at whether there was in fact a seizure within the meaning of the Fourth Amendment under the Supreme Court's *Brower* test – that is whether the plaintiff was subjected to the "intentional acquisition of physical control" by a government

actor.  *Id.* at 1328 (citing *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596 (1989)).

*Vaughan* analyzed the claim under both *Garner* and *Brower*, stating:

> It is clear that "apprehension by the use of deadly force is a seizure." *Tennessee v. Garner*, 471 U.S. 1, 7 [] (1985). However, the Supreme Court has held that a seizure occurs "only when there is a governmental termination of freedom of movement *through means intentionally applied.*" *Brower*, 489 U.S. at 597 [] (emphasis in original). The question remains whether [the officer's] action in firing his weapon at the truck and its driver can be deemed "means intentionally applied" to seize Vaughan.

*Id.*  The officer argued that because he did not intend to shoot the plaintiff, the plaintiff did not suffer a Fourth Amendment seizure.  *Id.*  The Eleventh Circuit disagreed, holding that because the officer fired his weapon to stop the plaintiff and the plaintiff "was hit by a bullet that was meant to stop him, he was subjected to a Fourth Amendment seizure."  *Id.* at 1329.  According to *Vaughan*,

> The Supreme Court has cautioned against a too finely drawn reading of "means intentionally applied." *Brower*, 489 U.S. at 598 [].  It is not necessary for the means by which a suspect is seized to conform exactly to the means intended by the officer; *otherwise courts could be compelled to conclude that "one is not seized who has been stopped by the accidental discharge of a gun* with which he was meant only to be bludgeoned, or by a bullet in the heart that was meant only for the leg." *Id.* at 598–99 [].

*Id.* at 1329 (emphasis added).   Having found that the plaintiff was subjected to a seizure, the *Vaughan* Court then analyzed the claim under *Garner's* three-part reasonable/deadly force test and found that under the plaintiff's version of the

facts, a "reasonable jury could find that [the officer] acted unreasonably in firing at the pickup truck."[22]  *Id.* at 1329.

Aside from the Eleventh Circuit's decision in *Vaughan*, this Court has found only two district courts in this Circuit addressing Fourth Amendment liability for accidental shootings occurring during the course of an arrest. However, both cases were decided before the Supreme Court's holding in *Graham*[23] that excessive force claims should be analyzed under an "objective reasonableness" standard (and not the Fourteenth Amendment's due process standards) and without regard to an officer's underlying intent or motivation where subjective concepts like "malice" and "sadism" are irrelevant to the court's inquiry.  *See Matthews v. City of Atlanta*, 699 F. Supp. 1552, 1156 (N.D. Ga. 1988); *Patterson v. Fuller*, 654 F. Supp. 418 (N.D. Ga. 1987).  Accordingly, while worth discussing, the holdings in *Matthews* and *Patterson* are not particularly helpful in determining Officer Griggs' liability under the Fourth Amendment as the law currently exists.

---

[22] On appeal, the plaintiff also argued that that even if he was not subjected to a "seizure" under the Fourth Amendment, he still may maintain a Fourteenth Amendment substantive due process claim based on his allegation that the officer's conduct "shocks the conscience" and exhibited deliberate indifference.  *Vaughan*, 343 F.3d at 1328.  In rejecting that claim, the *Vaughan* Court reasoned that "in cases in which police officers are required to make quick judgments about the proper course of action and therefore cannot deliberate before acting, . . . a violation of substantive due process will be found only when a plaintiff can show that the officer had a purpose to cause harm unrelated to the legitimate object of arrest," but recklessness will not suffice.  *Id.* at 1333.  The court affirmed the grant of summary judgment in favor of the officer on the substantive due process claim because the plaintiff did not present any evidence to suggest that the officer's actions were motivated by anything but the desire to arrest the suspects.  *Id.*
[23] *See Graham*, 490 U.S. at 397, 399, 399 n.2.

In *Matthews v. City of Atlanta*, a court in this District held that a police officer's nonvolitional shooting of a suspect does not constitute a seizure within the meaning of the Fourth Amendment.   699 F. Supp. at 1156.   *Matthews* involves facts similar to the case at bar.   The defendant police officer was having coffee in a restaurant when he was approached by an individual who informed him that a stolen vehicle, occupied by two men, was parked outside the restaurant.  *Id.* at 1553.  The officer exited the restaurant and approached the vehicle with his gun drawn.  *Id.* While pointing the gun at or near the suspect's head, the officer ordered the suspect to disengage the engine and exit the vehicle. *Id.*  The suspect did not comply, and instead requested permission first to place the vehicle in its parking gear.  *Id.*  The officer then reached into the vehicle in an effort to disengage its engine himself, at which point the vehicle lurched forward, striking either the officer's hand or his gun and causing it to fire a single shot into the suspect's head, fatally wounding him.  *Id.* at 1553-54.  The court in *Matthews* disagreed with the plaintiff's reliance on *Tennessee v. Garner* which held that "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment," 471 U.S. at 5, because:

> In *Garner*, the shooting was a volitional act. Here it was not and, according to the court's understanding of the word "seizure," it carries with it a very definite connotation of something or someone being put under the control of another as a result of acts intentionally taken. . . . Here, because there is no evidence that the officer intended to shoot the plaintiff's decedent or that he did so

volitionally, the shooting does not constitute a seizure within the
meaning of the fourth amendment.

*Id.* at 1556 (noting that "[i]n fact, the decedent had already been seized prior to
the shooting incident; i.e., when the officer drew his gun and ordered plaintiff's
decedent and his companion to exit the truck").   The *Matthews* Court
distinguished its holding from other cases involving nonvolitional shootings
where courts inexplicably "focused on whether the officer acted reasonably in
drawing his weapon in the first instance," despite the plaintiffs having sought
"recovery for the firing of the gun—not the drawing of it."  *Id.* at 1557 (citing
*Patterson v. Fuller*, 654 F. Supp. 418 (N.D. Ga. 1987) and *LeBer v. Smith*, 773
F.2d 101 (6th Cir. 1985)) (noting that "the logical extension of this position is that
if the officer acted reasonably in pointing the gun, then its subsequent discharge
was reasonable without evidence of the need for the actual use of deadly force").
*Matthews* recognized that both acts – the drawing and firing of a weapon –
constitute seizures and, under the proper facts, both could be actionable under
the Fourth Amendment.  *Id.*

Contrary to the opinion in *Matthews*, another court in this District held
that a victim of an accidental police shooting may be entitled to redress under
Section 1983 even though his Fourth Amendment rights were not intentionally
violated.  *See Patterson v. Fuller*, 654 F. Supp. 418, 427 (N.D. Ga. 1987) (rejecting
defendant-officer's contention that negligence does not suffice to prevail in a
Section 1983 action as not entirely correct, in light of the Eleventh Circuit's

*Gilmere*[24] holding that adopted an objective standard to determine whether a Fourth Amendment violation has occurred rather than a showing that the governmental official acted maliciously).   In *Patterson*, the district court adopted a broader view of the Fourth Amendment's reach, recognizing that "[w]henever an officer restrains the freedom of a person to walk away" the Supreme Court considers that the officer "has seized that person," and that "reasonableness depends on not only when a seizure is made, but also how it is carried out."   *Id.* at 426 (quoting *Garner*, 471 U.S. at 7-8); *see also Gilmere*, 774 F.2d at 1502 (examining reasonableness of officer's conduct post-seizure under *Garner's* three-part balancing test).   The facts in *Patterson* are as follows:   Officers were called to assist a local sheriff in apprehending two escapees from the county jail who were thought to be armed.   *Patterson*, 654 F. Supp. at 419.   Upon locating the suspected escapees, the defendant-officer entered the premises armed with his .38 caliber service revolver and commanded Patterson to come out with his hands up.   *Id.* at 420.   Patterson walked from the bedroom to the edge of the hallway but then made a move to go behind the door.   *Id.*   The officer immediately cocked his pistol and told Patterson to halt.   *Id.*   Patterson ultimately obeyed the officer's commands and laid down on the floor next to the other suspected escapee while the officer stood over him.   *Id.* While Patterson was on the floor, he moved his arm and the officer reacted by moving away, losing his balance, and causing the cocked revolver to fire, hitting Patterson in the head and

---

[24] *Gilmere v. City of Atlanta*, 774 F.2d 1495 (11th Cir. 1985).

killing him.  *Id.*  On the officer's motion for summary judgment based on qualified immunity, the *Patterson* Court held that the fact that the officer may not have intended to shoot the subject of his attempted arrest did not shield him from liability.  *Id.* at 427.  Rather, *Patterson* reasoned that the proper way to frame the court's Fourth Amendment inquiry would be to ask whether the officer acted unreasonably in using his weapon during the course of the arrest.  *Id.* (finding that in order to prevail on the Fourth Amendment claim, plaintiff must prove that the officer  acted unreasonably[25] in having his gun cocked while standing over the suspect's  head) (citing *Leber v. Smith*, 773 F.2d 101 (6th Cir. 1985), *cert. denied*, 475 U.S. 1084).

Courts in other Circuits have also viewed accidental police shootings in opposing ways.  The Second Circuit Court of Appeals, in *Dodd v. City of Norwich*, declared that the Fourth Amendment only applies to shootings designed for "the purpose of seizing" the suspect, not accidents that happen post-seizure.[26]  827 F.2d 1 (2d Cir. 1987), *cert. denied*, 484 U.S. 1007 (1988).  The facts in *Dodd* are somewhat similar to the case at bar.  Police officers responded to a silent burglar alarm, and while still standing outside the home, observed Dodd stick his head out an open window.  *Id.* at 2.  The defendant-officer drew his weapon and ordered Dodd to come out of the house, Dodd "complied," and "fell" out of the

---

[25] The *Patterson* court equated the concept of "negligence" with the objective reasonableness required by the Eleventh Circuit in *Gilmere*.

[26] *Dodd* was decided before the Supreme Court's holding in *Graham* that excessive force claims should not be analyzed under the Fourteenth Amendment's due process standards.  However, the *Dodd* Court relied, in part, on the Supreme Court's analysis in *Tennessee v. Garner*, applying a Fourth Amendment "reasonable seizure" test.

window onto the ground.  *Id.* at 2-3.  With his weapon drawn, the officer placed one handcuff on Dodd, who was still lying on the ground but had refused to place both hands over his head.  *Id.* at 3.  As the officer attempted to put the other handcuff on Dodd, he "jerked forward" and reached for the officer's gun.  *Id.*  The officer "instinctively reacted by pulling his hand (and the gun) away from Dodd," and the gun "accidentally" discharged, killing Dodd.  *Id.*  On reargument, the Second Circuit determined, as a matter of law, that there was no Fourth Amendment violation because "the shooting was a pure accident" and only "intentional conduct" can support a Fourth Amendment violation.[27]  *Id.* at 7 (construing *Garner* as barring the deliberate use of deadly force to seize an unarmed, fleeing, suspected felon but not the inadvertent shooting of an already apprehended burglar during a struggle initiated by him in an attempt to disarm the arresting officer after he had apparently surrendered).  According to the Second Circuit, the officer did not shoot Dodd "for the purpose of seizing him," rather the seizure had already taken place by the time the officer had begun handcuffing Dodd, and the officer "did not act unreasonably in seizing Dodd in

---

[27] Although *Dodd* was decided before *Brower*, it follows the same logic as the *Brower* Court that a Fourth Amendment violation must be grounded on intentional conduct on the part of the officer.  *Dodd* has been relied on by numerous district courts post-*Brower* in determining liability under the Fourth Amendment for accidental police shootings.  *See Brice v. City of York*, 528 F. Supp. 2d 504, 510 (M.D. Pa. 2007) (following Second Circuit's analysis in *Dodd* that held that an accidental shooting could not support an excessive force claim); *Clark v. Buchko*, 936 F. Supp. 212 (D. N.J. 1996) (following line of cases concluding that plaintiff cannot maintain Fourth Amendment claim against officer who lacked intent to seize them by the accidental firing of the gun); *Troublefield v. City of Harrisburg*, 789 F. Supp. 160, 166 (M.D. Pa. 1992) (finding Supreme Court's decision in *Brower* "requires that some nature of volitional act on the part of the state actor must cause the harm to plaintiff for a fourth amendment excessive force claim to sound" and holding that no Fourth Amendment rights were violated when officer "did not intend the bullet to bring plaintiff within his control"); *see also Glasco v. Ballard*, 786 F. Supp. 176, 177 (E.D. Va. 1991) (requiring intent to support excessive force claim based on shooting).

this fashion." *Id.* at 7.  In holding that the officer did not deprive Dodd of any

constitutional rights in effectuating the arrest, the Court reasoned that,

> [i]t makes little sense to apply a standard of reasonableness to an
> accident. If such a standard were applied, it could result in a fourth
> amendment violation based on simple negligence. The fourth
> amendment, however, only protects individuals against
> "unreasonable" seizures, not seizures conducted in a "negligent"
> manner.  The Supreme Court has not yet extended liability under the
> fourth amendment to include negligence claims.

*Id.* at 7-8.

On the other hand, the Sixth Circuit in *Pleasant v. Zamieski,* viewed an

accidental shooting as separate from other potential police conduct that may

constitute an actionable seizure as that term is used in the Fourth Amendment.

895 F.2d 272, 276-77 (6th Cir. 1990).  The parties in *Pleasant* disagreed over

whether "intent was an implicit element of" *Garner*'s prohibition against the

unreasonable use of deadly force.  *Id.* at 275.  The officer argued that *Garner* did

not apply in the context of an allegedly negligent use of a handgun in the course

of apprehending a suspected felon where the shooting death of the deceased was

undisputedly accidental and not the result of the deliberate use of deadly force.

*Id.*  The *Pleasant* Court held that in light of *Graham*, "all claims that law

enforcement officials have used excessive force—deadly or not—in the course of

an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed

under the Fourth Amendment and its 'reasonableness' standard," and that

*Graham*'s objective standard applies "without regard to [the actual officer's]

underlying intent or motivation."  *Id.* at 276 (quoting *Graham*, 490 U.S. at 396-

97).   Consequently, the *Pleasant* Court found that *Graham* requires courts to determine whether the officer's actions in the course of his attempt to arrest the plaintiff, ultimately resulting in an unintentional use of deadly force, were objectively reasonable under the circumstances.  *Id.; see also, e.g., Tallman v. Elizabethtown Police Dep't,* 167 F. App'x 459 (6th Cir. 2006) (holding that in determining officer's liability under Fourth Amendment for accidentally shooting and killing suspect following high-speed police chase, court must focus reasonableness inquiry on the officer's actions leading up to the accidental discharge of the weapon); *Leber v. Smith,* 773 F.2d 101, 105 (6th Cir. 1985) (viewing issue of officer's liability for accidental shooting under Fourth Amendment as being whether the totality of the officer's actions during the coure of the seizure were reasonable under the Fourth Amendment).

In *McCoy v. City of Monticello,* the Eighth Circuit Court of Appeals chose *not* to decide the question whether "after an intentional Fourth Amendment seizure has occurred, does an accidental shooting implicate the Fourth Amendment?"  342 F.3d 842, 847, n.3 (8th Cir. 2003).  The plaintiffs in *McCoy* had been celebrating the New Year's Eve holiday at a club.  *Id.* at 845.  Shortly before midnight they left the club, and Mr. McCoy's truck slid sideways as it exited the parking lot due to the slippery road conditions caused by snow and sleet in the area.  *Id.*  Two officers observed Mr. McCoy's truck sliding sideways or fishtailing and pursued him in a police cruiser with the blue lights and siren in operation.  *Id.*  Mr. McCoy claims he drove for a mile without incident and was

unaware of the police car behind him.  *Id.*  At some point, McCoy heard a siren and saw police lights, but assumed the police were pursuing a different vehicle and continued driving.  *Id.*  The officers eventually passed McCoy and pulled the police cruiser in front of his truck.  *Id.*  Mr. McCoy swerved to miss the police car, and his truck went off the road into a ditch.  *Id.*  He then exited his truck and raised his arms into the air after observing two officers approaching him.  *Id.*  One of the officers ran toward Mr. McCoy with his arms extended over his head and hands clasped, as if holding a handgun.  *Id.*  Before reaching Mr. McCoy, the officer slipped, his gun discharged, and a bullet struck Mr. McCoy in the chest, severely injuring him.  *Id.*

The court in *McCoy* found that the officers' conduct effected a seizure, relying on the Supreme Court's holding in *Brower* that a Fourth Amendment "seizure" requires an intentional act by a governmental actor and that "the Fourth Amendment addresses 'misuse of power,' . . . not the accidental effects of otherwise lawful government conduct."  *Id.* (quoting *Brower*, 489 U.S. at 596-97).  Without considering whether the shooting itself constituted a seizure, the court looked to the officer's preceding conduct to find that the defendant-officer intended to stop Mr. McCoy's vehicle and terminate his freedom of movement by a show of authority, and drew his gun with the intent to cause Mr. McCoy to submit to the officer's authority by threat of force, thereby satisfying *Brower*'s "through means intentionally applied" standard. *Id.* at 847 (quoting *Brower*, 489 U.S. at 597).  The court further noted that "[i]n response to this display of force,

McCoy . . . exited his truck and raised his hands above his head, thereby establishing a seizure." *Id.* In analyzing whether the seizure (not the accidental shooting) was reasonable, *McCoy* considered the defendant- officer's conduct during the traffic stop and the "display of force" separately. *Id.* at 848. The court found that the officers, reasonably believing they were pursuing an actively fleeing suspect who was possibly intoxicated and driving erratically, had probable cause to stop Mr. McCoy's truck. *Id.*

With respect to the officer's conduct that ultimately resulted in the shooting, the *McCoy* Court reasoned that the "relevant inquiry [was] not whether [the officer's] act of firing his gun was 'objectively reasonable,' but whether, under the totality of the circumstances, his act of drawing his gun was 'objectively reasonable.'" *Id.* Based on the totality of the circumstances, the court's view was that an objectively reasonable officer could have believed that Mr. McCoy was driving while intoxicated and was attempting to avoid arrest for that reason, or for some other illegal purpose. *Id.* at 848-49. The officer's actions in approaching Mr. McCoy with his gun drawn after McCoy had exited the truck with his hands in the air after swerving off the road into a ditch was therefore "objectively reasonable." *Id.* at 849. As a result of finding the officer's conduct to be reasonable under the circumstances, the *McCoy* Court declined to decide the harder issue of whether an accidental shooting following an intentional seizure

conducted in an unreasonable manner could result in a Fourth Amendment violation.[28]  *Id.* at 847, n.3.

This Court will follow the more persuasive second line of reasoning that an accidental firearm discharge resulting in an unintentional shooting during the course of an arrest *may* constitute excessive force under the Fourth Amendment if the officer's course of conduct preceding the shooting is unreasonable under the circumstances.  The Supreme Court's key decisions on excessive force – and the Eleventh Circuit's *Vaughan* decision – inform the Court's determination. First, the Supreme Court held in *Tennessee v. Garner* that "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." 471 U.S. at 5.  Second, the Supreme Court in *Graham v. Connor* stated that the Fourth Amendment provides protection against excessive force to individuals "in the course of an arrest," and that such protection lasts at least until "the point at which the arrest ends and pretrial detention begins." 490 U.S. at 395, n. 10.  Furthermore, in solidifying *Garner*'s reasonableness standard, *Graham* explained that "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances, without regard to their underlying intention. . . ." *Id.* at 388.

---

[28] *See also Watson v. Bryant*, --- F. App'x ---, 2013 WL 3227633, at *4 (5th Cir. 2013) (concluding that "in the absence of evidence showing that [defendant] intended to use deadly force, [] the negligent shooting here did not *itself* violate [plaintiff's] Fourth Amendment rights," but that "[a]n undisputedly accidental shooting, however, does not end the inquiry. [Defendant] still may have violated the Fourth Amendment if he acted objectively unreasonably by deciding to make an arrest, by drawing his pistol, or by not reholstering it before attempting to handcuff [plaintiff]." (emphasis added).

In *Scott v. Harris,* the Supreme Court discussed its earlier holding in *Brower*, upon which a majority of the courts that come out the other way on this issue rely, stating:

> The only question in *Brower* was whether a police roadblock constituted a seizure under the Fourth Amendment.  In deciding that question, the relative culpability of the parties is, of course, irrelevant; a seizure occurs whenever the police are "'responsib[le] for the termination of [a person's] movement,'" [cit.] regardless of the reason for the termination. Culpability is relevant, however, to the reasonableness of the seizure—to whether preventing possible harm to the innocent justifies exposing to possible harm the person threatening them.

550 U.S. 372, 384 (2007) (citing *Brower v. Cnty. of Inyo*, 489 U.S. 593 (1989)). As the Eleventh Circuit recognized in *Vaughan*, the Supreme Court has cautioned against a too finely drawn reading of the "means intentionally applied," language in *Brower*.  *Vaughan,* 343 F.3d at 1328 (citing *Brower,* 489 U.S. at 598.)   In *Brower*, the Supreme Court refused to distinguish, for purposes of determining a "seizure," between a "roadblock that is designed to give the oncoming driver the option of a voluntary stop (e.g., one at the end of a long straightaway), and a roadblock that is designed precisely to produce a collision (e.g., one located just around a bend)." 489 U.S. at 598.  Notably, the Court stated:

> In determining whether the means that terminates the freedom of movement is the very means that the government intended ***we cannot draw too fine a line, or we will be driven to saying that one is not seized who has been stopped by the accidental discharge of a gun*** with which he was meant only to be bludgeoned, or by a bullet in the heart that was meant only for the leg. We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result.

*Id.* at 598-99 (emphasis added).[29]   The *Brower* Court was careful to point out, however, that its finding "[was] not to say that the precise character of the roadblock is irrelevant to further issues in the case," and noted that the circumstances surrounding the use of the roadblock as a "seizure" – i.e. whether the police shown the vehicle's headlights to blind the oncoming driver – "may yet determine the outcome of [the] case." *Id.* at 599.  Indeed, the mere proclamation by the officer regarding his lack of intent to injure the plaintiff does not control by itself. Thus, limiting the Fourth Amendment analysis to the shooting alone affords too narrow a view of the scope of the Fourth Amendment's protections against the use of excessive force during the course of an arrest by looking only at the end result.  *See Johnson*, 41 F. Supp. 2d at 929; *Estate of Starks v. Enyart*, 5 F.3d 230 (7th Cir. 1993).

> 2.   *Reasonableness of Griggs' Actions in Carrying Out the Arrest of D.M.C.*

Having concluded that Griggs' unintentional shooting of D.M.C. during the course of the arrest does not insulate him from liability under the Fourth

---

[29] The Court recognizes that *Brower* did not say that the accidental discharge of a gun used as a bludgeon was an unreasonable seizure *per se*.  "Indeed, if, as *Graham* says, excessive force cases are to be analyzed under the fourth amendment's reasonableness standard with 'careful attention to the facts and circumstances of each particular case,' there can be no *a priori* judgments of categorical unreasonableness. The inquiry as to whether or not some action constitutes a 'seizure' under the fourth amendment is distinct from the inquiry as to whether an action already found to constitute a fourth amendment seizure is also 'unreasonable' under the fourth amendment. 'Seizure' alone is not enough for § 1983 liability; the seizure must be 'unreasonable.'" *Pleasant v. Zamieski*, 895 F.2d 272, 277 (6th Cir. 1990) (citing *Graham*, 490 U.S. at 396 and *Brower*, 489 U.S. at 599).

Amendment,[30] the Court must now determine whether his conduct leading up to the gun's accidental discharge was objectively reasonable.  As an initial matter, the Court finds that the officers' actions here constituted a seizure: Officer Griggs and Deputy Henry issued verbal commands to D.M.C. to get down on the ground and made a show of authority by using their weapons and a K-9 during the pursuit.  D.M.C. partially complied by going down on one knee and placing one hand in the air prior to the gun's accidental discharge, thereby effectuating the seizure.  *See, e.g., Matthews,* 699 F. Supp. at 1556 (finding that "[i]n fact, the decedent had already been seized prior to the shooting incident; i.e., when the officer drew his gun and ordered plaintiff's decedent and his companion to exit the truck"); *Dodd*, 827 F.2d at 7 (noting that "the seizure had already taken place by the time the officer had begun handcuffing [the suspect]"); *McCoy*, 342 F.3d at 845-47 (finding that officer's armed pursuit of suspect with intent to detain by use of show of authority and threat of force constituted seizure when suspect surrendered by exiting vehicle and raising his hands above his head).

---

[30] The Court must briefly address Plaintiffs' argument that whether the shooting was in fact accidental, or whether it was intentional, is a credibility determination that must be made by the jury.  The Court disagrees based on the undisputed evidence presented on summary judgment.  Despite Plaintiffs' argument that a jury could reasonably conclude that Griggs' discharge of the gun was intentional, they have presented no evidence that would demonstrate a triable issue as to Griggs' intent as is their burden on summary judgment.  *See Tallman*, 167 F. App'x at 463 (finding no evidence from which a jury could conclude that officer intentionally discharged his weapon in light of officer's testimony and plaintiff's own expert's conclusion that discharge was unintentional); *cf. Sorensen v. McLaughlin*, 2011 WL 1990143 at *5 (D. Minn. 2011) (noting that a reasonable factfinder could conclude that shooting was not an accident, despite officer's insistence that it was based, in part, on the fact that the officer did not describe the shooting as accidental because the plaintiff bumped into him until four days after the shooting, and after he had conferred with counsel).  Notably, Plaintiffs' failure to train claim against Fulton County is premised entirely on the fact that the shooting was accidental.

Plaintiffs argue that because D.M.C. was unarmed, compliant and non-resistant, Griggs was not justified in push-kicking D.M.C. to the ground to accomplish his arrest.  According to Plaintiffs, "by definition, any level of force is excessive if there is no justification for the use of force at all."  However, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use *some degree* of physical coercion or threat thereof to effect it." *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009) (citing *Lee*, 284 F.3d at 1197) (emphasis added).  The undisputed facts do not support Plaintiffs' version of the facts, even when viewed in their favor, that D.M.C. was unarmed, compliant and non-resistant at the time Officer Griggs pushed him to the ground with his foot – by employing a "push-kick."  Rather, the evidence indicates that D.M.C. was what officers refer to as "passively-resistant" and had only started to go down on his knees, had only visibly put one hand above his head while appearing to conceal his other hand from the officers' view, and appeared to be considering whether to comply with the officers' commands or flee a second time.

The Court cannot find that Officer Griggs' conduct during the arrest was objectively unreasonable under the Fourth Amendment as a matter of law warranting summary judgment in Plaintiffs' favor.  First, the Court cannot conclude that it was unreasonable for Defendant Griggs to have his gun drawn during the pursuit.  Defendant Griggs and the other officers pursuing D.M.C. reasonably believed that he was the suspect who fled the scene after assaulting

Officer Guin.  The incident occurred at night, in nearly pitch-black conditions, and Defendant Griggs was using his weapon-mounted tactical light to improve visibility.  Defendant Griggs had no way of knowing whether D.M.C. was armed, as one of D.M.C.'s hands was concealed from his view.  *See Jackson v. Sauls*, 206 F.3d 1156, 1170-72 (11th Cir. 2000) ("[T]his Court has held that an officer's drawing a weapon and ordering a person stopped to lie on the ground does not necessarily constitute excessive force during an investigatory stop."); *Pleasant v. Zemieski,* 895 F.2d at 273-77 (finding officer was justified in drawing his gun because the incident occurred at night, when the officer arrived at the scene a felony was taking place, the suspected felon was in a car which he did not own, and the officer could not know whether the suspect was armed).[31]

Second, although Officer Griggs was trained to re-holster his weapon before "going hands on," the Court cannot conclude that his failure to put the gun away before "push-kicking" D.M.C. to the ground was so unreasonable as to amount to excessive force.  By necessity, Officer Griggs was using his weapon-mounted tactical light so that he could locate D.M.C.  Griggs testified that he had

---

[31] The cases cited by Plaintiffs in which it was held that nonviolent suspects, accused of minor crimes, who have not resisted arrest were subjected to unconstitutional excessive force are therefore distinguishable.  *See Fils v. City of Aventura*, 647 F.3d 1272, 1289 (11th Cir. 2011) (holding that "unprovoked force against a non-hostile and non-violent suspect who has not disobeyed instructions violates that suspect's rights under the Fourth Amendment" and the plaintiffs' version of the facts showed that he was not violent, did not disobey police orders, did not resist arrest, and posed no risk to the officers or others); *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008) (finding that the defendant-officer used excessive gratuitous force when he punched the plaintiff in the stomach while the plaintiff was handcuffed, and was not struggling or resisting arrest); *Walker v. City of Riviera Beach*, 212 F. App'x 835, 838-39 (11th Cir. 2006) (finding use of excessive force where officer "slammed" his gun against the suspect's forehead immediately upon approaching suspect's vehicle after suspect had stopped vehicle in response to officer's commands to pull over).

turned off the light in order to holster the weapon before making contact with D.M.C., but was unable to see and had to turn the light back on.  He therefore requested that one of the other assisting officers "put some light" on D.M.C. because he needed to holster the weapon before moving in for the arrest.  However, the other officers were each more than twenty-five (25) yards away from Griggs and D.M.C. at the time.  After pushing D.M.C. to the ground so that he could not run or cause immediate threat, Officer Griggs began to holster the weapon so that he could place the handcuffs on him when the gun went off. *Pleasant v. Zemieski,* 895 F.2d at 276-77 (finding officer's failure to re-holster weapon not to be unreasonable and that although officer should have been aware that suspect did not pose a threat, under the circumstances the officer "had little time to react" given that the plaintiff would have escaped had he taken the time to put his gun away); *cf. Johnson v. City of Milwaukee,* 41 F. Supp. 2d 917 (finding there were genuine questions about the reasonableness of the officer's conduct in failing to holster weapon before frisking suspect who was already pinned against fence, surrendered on command, and placed his hands in the air, and where the officer had a number of more reasonable options to control the situation without escalating the level of force necessary, including waiting for back-up or ordering the plaintiff to lie down on the ground).

For the same reasons, the Court also finds that Officer Griggs' use of the "push-kick" was not excessive under the circumstances.  Although D.M.C. was not actively resisting the officers' commands to "get down on the ground," he

hadn't fully complied and seemed to be hesitating.  Griggs testified that after locating D.M.C., the entire incident happened within a matter of seconds. Without the benefit of 20/20 hindsight, Officer Griggs reasonably believed that his actions were necessary and justified under tense and quick-moving circumstances.  This Court "cannot [] use the wisdom of hindsight to judge [the officer's] actions [and] must be careful not to 'deny the practical difficulties of attempting to assess the suspect's dangerousness.'" *Pleasant*, 895 F.2d at 276 (quoting *Graham,* 490 U.S. at 396 and *Garner,* 471 U.S. at 20). "While the consequences of his actions were, by accident, tragic, they were not objectively unreasonable."  *Id.* at 277; *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1333 (11th Cir. 2004) (courts must view "the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal").

Having found that Griggs' actions did not constitute an unreasonable seizure in violation of D.M.C.'s Fourth Amendment rights, the Court need not address the second prong of the qualified immunity analysis – whether the constitutional right in question was clearly established at the time of the violation.  Accordingly, the Court **GRANTS** Defendant Griggs' Motion for Summary Judgment [Doc. 59] on this claim, and **DENIES** Plaintiffs' Cross-Motion for Partial Summary Judgment [Doc. 73].

### B.   Plaintiff's State Law Negligence Claim Against Officer Griggs[32]

Defendant Griggs failed to respond in opposition to Plaintiffs' Cross-Motion for Summary Judgment on their state law negligence claim.  However, Griggs contends in his own motion that he is entitled to official immunity because he acted in the scope of his discretionary authority as a police officer and no evidence has been presented that suggests he acted with malice in shooting D.M.C.  In response, Plaintiffs assert that (1) the doctrine of official immunity does not protect Griggs against liability for negligence in the performance of ministerial acts such as the proper firing of his weapon pursuant to his training, and (2) a jury could reasonably find that Griggs acted with actual malice or a deliberate intent to harm.  As a result of his failure to respond at all to Plaintiffs' motion, Griggs is deemed to have admitted Plaintiffs' statement of material facts submitted in support of their cross-motion for summary judgment to the extent such facts are not otherwise contradicted by the record.

Official immunity under Georgia law "offers limited protection from suit to governmental officers and employees." *Gilbert v. Richardson*, 452 S.E.2d 476, 481 (Ga. 1994) (citing *Cooper v. Swofford*, 368 S.E.2d 518 (Ga. 1988)); *Martin v. Ga. Dept. of Pub. Safety*, 357 S.E.2d 569 (Ga. 1987), *cert. denied*, 484 U.S. 998 (1988)).  Individual government employees are shielded by official immunity

---

[32] Fulton County also seeks summary judgment on Plaintiffs' state law claims against Fulton County as barred by sovereign immunity.  However, Plaintiffs have not asserted any state law claims against Fulton County.  Accordingly, Fulton County's motion [Doc. 89] with respect to Plaintiffs' state law claims is **DENIED AS MOOT**.

from damages suits unless the plaintiff can establish that the official negligently performed a ministerial act or performed a discretionary act with malice or an intent to injure. *See Grammens v. Dollar*, 697 S.E.2d 775, 777 (Ga. 2010); *Glass v. Gates*, 716 S.E.2d 611, 621 (Ga. Ct. App. 2011), *cert. granted* (Jan. 23, 2012), *aff'd,* 729 S.E.2d 361 (Ga. 2012).

### 1. *Discretionary v. Ministerial Duty*

Whether Griggs is entitled to official immunity is ultimately a question of law for the Court to determine. *Greenway v. Northside Hosp., Inc.*, 730 S.E.2d 742, 749 (Ga. Ct. App. 2012); *Glass v. Gates*, 716 S.E.2d 611 (Ga. Ct. App. 2011). However,

> where the relevant facts pertaining to immunity are in dispute, the trial court is without authority to resolve those factual issues on a motion for summary judgment. A jury must resolve the factual issues, after which the trial court "determine[s] whether the employee's acts were discretionary or ministerial and, thus, whether the employee is entitled to official immunity.

*Glass*, 716 S.E.2d at 621 (quoting *Nichols v. Prather*, 650 S.E.2d 380, 387 (Ga. Ct. App. 2007)). "The determination of whether an action is discretionary or ministerial depends on the character of the specific actions complained of, not the general nature of the job, and is to be made on a case-by-case basis." *Greenway*, 730 S.E.2d at 749 (internal citation and punctuation omitted); *Vann v. Finley*, 721 S.E.2d 156 (Ga. Ct. App. 2011).

> A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. A discretionary act, however, calls for the exercise of personal deliberation and

> judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed.

*Grammens*, 697 S.E.2d at 777; *Glass*, 716 S.E.2d at 621. "Where there is an established policy requiring an official to take specified action in a specified situation, the policy creates a ministerial duty on the part of the official to perform the specified task." *Greenway,* 730 S.E.2d at 750 (internal citation and punctuation omitted); *Barnard v. Turner Cnty.*, 701 S.E.2d 859 (Ga. Ct. App. 2010).

The Georgia Supreme Court has held that generally a law enforcement officer exercises discretion in responding to an emergency call, engaging in high speed chases, executing a search warrant, and firing a gun at a suspect. *Cameron v. Lang*, 549 S.E.2d 341, 345-46 (Ga. 1989) (high speed car chase); *Gilbert v. Richardson*, 452 S.E.2d 476 (Ga. 1994) (emergency call); *Kidd v. Coates*, 518 S.E.2d 124, 125 (Ga. 1999) (plaintiff conceded that officers' acts in executing warrant and firing guns were discretionary).  Plaintiffs argue, however, that during his armed pursuit of D.M.C., Griggs was performing a ministerial duty pursuant to the Fulton County Police Department's use of force training requiring officers to index their weapons.  In support of their argument, Plaintiffs offer the testimony of Officer Griggs himself, Lieutenant Richard Nable, the chief officer over firearm training for the Fulton County Police Department, and the affidavit of Assistant Chief of Police Gary Stiles.

Officer Griggs admitted that "he had an absolute duty to keep his finger off the trigger at all times, unless he intended to shoot, and that he had no discretion to do otherwise" pursuant to his police training.  (Pls.' SMF ¶¶ 24, 28-29.)  Officer Griggs further admits that by failing to properly index his finger, he failed to follow that training.  (*Id.* ¶¶ 29-31.)  In addition, according to Assistant Chief Stiles,

> the Fulton County Police Department maintained and continues to maintain policies prohibiting officers from placing their fingers inside the trigger guard of their firearms.  Officers receive state mandated and in-service training requiring officers to only place their fingers inside the trigger guard of their weapons only when they reasonably believe their life is in danger or that they will suffer serious bodily injury.

(Stiles 1st Aff. ¶ 4.)  Similarly, Officer Griggs testified that:

> A.   We are trained specifically what we call index the weapon, meaning you don't put your finger in the trigger well or on the trigger.
>
> Q.   And that – is that something that you're definitely not supposed to do?
>
> A.   Yeah.  I mean you're trained when you're not using – when you don't want the gun to fire, you want to keep your finger on the – it actually rests on the slide.
>
> Q.   I mean is that basically a judgment call on your part as to whether to follow that or not , or is that something that you're always required to follow if you don't intend to shoot the weapon?
>
> A.   No.  That's just how you're trained.  You're trained to keep your finger there until you need to put it on the trigger to pull the trigger.
>
> Q.   And are you supposed to do – are you supposed to act in accordance with that training?
>
> A.   Yes.

(Griggs Dep. 115:21-116:14.)

Q.  And since you didn't mean to shoot him, there was absolutely no circumstance under which your training would have – or your policies would have allowed you to have your finger on the trigger; is that right?

A.  I shouldn't have had my finger on the trigger.

(Griggs Dep. 233:5-9.)  In addition, Lieutenant Nable testified that:

Q.  . . . if you have your finger inside the trigger guard or anything inside the trigger guard, there is a danger of being able to depress both?

A.  Yes.

Q.  And that's why you train officers not to have their finger inside the trigger guard unless they intend to shoot?

A.  And that would be true with any gun, not just this gun. . . .

Q.  In fact, that's one of the four cardinal rules?

A.  Right.

Q.  Don't put your finger on the trigger?

A.  Right.

Q.  So that's not something . . . that's discretionary with the officer or anything?

A.  No.

Q.  That's a mandatory no-no?

A.  Correct.

(Nable Dep. 75:8-76:6.)

Based on this evidence, Plaintiffs assert that "the duty of a police officer to keep their finger off the trigger when not intending to shoot is an absolute duty that directs the officer to perform a specific action in a specific circumstance" in which there "is no room for deliberation."  (Pls.' Resp. Br. at 23.)  Thus, according to Plaintiffs, the evidence establishes that Griggs violated a ministerial duty and therefore is not entitled to official immunity for Plaintiffs' negligence claim as a matter of law.

In *Glass v. Gates*, the Georgia Court of Appeals found that an analogous situation created a factual dispute over whether a correctional officer was performing a ministerial or discretionary act.  716 S.E.2d at 621.  *Glass* involved a county correctional facility inmate who was killed while operating a tractor on a prison work detail supervised by the defendant correctional officer.  *Id.* at 613. The plaintiffs brought a wrongful death and survival action against the county and the officer alleging that Glass's injury and death were the result of negligence in the supervision of the work detail.  *Id.*  On summary judgment, the plaintiffs presented evidence regarding the existence of a departmental policy with which the officer was required to comply when a tractor became stuck: the officer testified during his deposition that he told an investigator that the "unwritten policy for pulling tractors that were stuck was to contact the facility and request they send the truck and the truck would be used to pull the tractor out." *Id.* at 621.  In reversing the trial court's grant of summary judgment in favor of the officer, the Georgia Court of Appeals found that this evidence, when construed in the light most favorable to the plaintiffs with all inferences drawn in their favor, would permit the conclusion that the officer had a ministerial duty imposed upon him:

> The unwritten departmental policy, as described by [defendant], required a work detail supervisor such as [defendant] to take specified action (call the work camp and request a service truck) in a specified situation (when a tractor became stuck). As reflected in [defendant's] statement, the departmental policy did not require the work detail supervisor to exercise his judgment or discretion, but rather imposed a ministerial duty.

*Id.* (quoting *Grammens*, 697 S.E.2d at 777 ("Where there is an established policy requiring an official to take specified action in a specified situation, the policy creates a ministerial duty on the part of the official to perform the specified task.")).  The Court further acknowledged that, faced with evidence presented by the defendants that the officer also had discretion over whether to contact the work camp and request a service truck, including testimony from the warden, the officer's prior inconsistent statements during the investigation created "a factual dispute over whether a ministerial duty had been imposed upon [the officer]" that must be resolved by a jury.  *Id.* at 622; *see also Greenway*, 730 S.E.2d at 750 (finding that trial court erred by granting summary judgment to sheriff's deputy based on official immunity where genuine issues of material fact existed as to whether his actions were in accordance with department policy, thus precluding determination as a matter of law of whether he breached a ministerial or discretionary duty).

The Georgia Court of Appeals in *Gish v. Thomas* addressed whether a sheriff's deputy was entitled to official immunity for the accidental death of a prisoner who committed suicide with the deputy's gun.  691 S.E.2d 900 (Ga. Ct. App. 2010).  Following the transport of the prisoner from one facility to another, the deputy placed his loaded service pistol in the front seat of his patrol car prior to exiting the vehicle to extract the prisoner.  *Id.* at 902-903.  While the deputy was outside the vehicle, the prisoner managed to retrieve the gun, place it in his

mouth, and pull the trigger, killing himself.  *Id.* at 903.  The deceased's mother filed suit for wrongful death.  The trial court in *Gish* found that the act of transporting prisoners was a discretionary function and granted the deputy immunity from suit.  *Id.* at 904.  On appeal, the plaintiff argued that the deputy committed negligent ministerial acts when he left his loaded weapon on the front seat of his vehicle and when he improperly handcuffed the prisoner.  *Id.*  The Georgia Court of Appeals agreed with the following reasoning of the trial court that under the facts of the case, transporting prisoners was a discretionary act:

> [w]hile the Sheriff's Office does provide some guidance on prisoner transport, nothing in the policies can be said to render the act of prisoner transport ministerial; Deputy Gilmer still had wide discretion in handling his job and much of the specifics of prisoner transport were left to his personal judgment. Further, it is clear that the danger inherent in prisoner transport and the judgment that must be applied to handle different transportees renders the act discretionary.

*Id.* at 905.  The plaintiffs in *Gish* argued, however, that the issue was not whether the act of transporting prisoners was discretionary or ministerial, but whether the specific acts of storing weapons in a patrol car and the handcuffing of inmates were discretionary or ministerial acts.  *Id.*  The *Gish* Court recognized, without deciding, that those specific acts could constitute the relevant inquiry for purposes of determining the deputy's entitlement to official immunity.  However, because it was undisputed that at the time of the deceased's death, the sheriff's office did not have written departmental policies or procedures governing handcuffing inmates during transport or the securing of weapons in patrol cars,

the Court of Appeals found that trial court properly rejected the plaintiff's argument that there were established policies and procedures giving rise to a ministerial duty in the case.[33]  *Id.*

In support of its own motion for summary judgment, Fulton County submitted evidence that the Fulton County Police Department maintained and continues to maintain policies prohibiting officers from placing their fingers inside the trigger guard of their firearms unless they reasonably believe their life is in danger or that they will suffer serious bodily injury.  (Fulton Cnty. SMF ¶ 5.) Officer Griggs was aware of the Fulton County policy that under no circumstances is an officer to have his finger on the trigger unless he intends to use deadly force. (*Id.* ¶ 45.)   Plaintiffs have presented evidence, undisputed at this point, that Officer Griggs admitted that there was no need to use deadly force under the circumstances and that he should not have had his finger on the trigger.  Here Griggs testified that he violated the County's training protocols on the night of the incident by stating "obviously my finger wasn't indexed" as his training required, because his finger must have been on the trigger when the gun discharged.[34] (Griggs Dep. 117:14-118:6, 122:17-123:10, 125:3-8, 206:18-22.)  Accordingly, there is evidence from which a reasonable jury could find that Officer Griggs did not have the discretion to ignore or violate the Fulton County Police Department's

---

[33] The *Gish* court further found that despite the plaintiff's reliance on various provisions of Georgia's Peace Officer Standards and Training Council (P.O.S.T.) training manual to establish these acts as ministerial, these provisions (1) provided only general guidelines, and had not been explicitly adopted by the sheriff's office, and (2) the deputy was never instructed to put his gun in a certain location or to handcuff a prisoner in a certain way. *Gish*, 691 S.E.2d at 905.

[34] Defendant Griggs testified that he was not aware that his finger was on the gun's trigger until he heard the shot.  (Griggs Dep. 117:14-20.)

express mandatory policy requiring that he keep his finger off the trigger during the pursuit and arrest of D.M.C.  Thus, there exists a genuine issue of material fact in dispute as to whether Officer Griggs was acting within his discretionary authority in his manner of effecting the arrest of D.M.C. or whether he had an absolute ministerial duty under the circumstances to act in conformity with the County firearms policy.  This central disputed issue precludes the Court from granting judgment that Officer Griggs is entitled to official immunity for Plaintiffs' negligence claim as a matter of law.  Defendant Griggs' Motion for Summary Judgment [Doc. 59] on these grounds is therefore **DENIED**.

### 2.   *Malice or Intent to Injure*

The Georgia Constitution provides that state officers and employees "may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions."   GA. CONST., art. I, § 2, ¶ IX(d).  When determining whether a public agent is entitled to official immunity for discretionary acts, a court must evaluate the agent's subjective intent. *Jordan v. Mosley*, 487 F.3d 1350 (11th Cir. 2007) ("Unlike qualified immunity under federal law, we must inquire into [the public agent's] subjective intent to determine whether he has official immunity under Georgia law.").  Specifically, a public agent loses the protection of official immunity if the agent acted with "actual malice or intent to injure."   *Cameron v. Lang*, 549 S.E.2d 341, 345 (Ga. 2001).  "Actual malice" refers to "a deliberate intention to do wrong" which is more than simply "reckless disregard for the rights or safety of

others." *Murphy v. Bajjani*, 647 S.E.2d 54, 60 (Ga. 2007) (quoting *Merrow v. Hawkins*, 467 S.E.2d 336 (Ga. 1996)).  The agent's deliberate intention "must be the intent to cause the harm suffered by the plaintiffs."  *Marshall v. Browning*, 712 S.E.2d 71, 74 (Ga. Ct. App. 2011).  Like actual malice, the term "intent to cause injury" means the "actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury." *Id.*

Plaintiffs contend that malice may be inferred[35] because Griggs admitted to deliberately kicking D.M.C. when there was no justification for the use of any force at all.  However, Plaintiffs fail to give due credence to Griggs' testimony which does not support Plaintiffs' assertions.  Contrary to Plaintiffs' assertion that Griggs admitted that there was no justification for the use of any force at all, Griggs testified as follows:

> Q.   You did intend to use, you know, reasonable force.  Well, you intended to use force to subdue this guy, right?
> A.   Yes, I did.
> Q.   But you didn't intend to shoot him?
> A.   Correct.
> Q.   Okay.  Now, under the continuum of force, it really wasn't reasonable to use any force against [D.M.C.], was it?
> A.   I don't see any need at that time to use any force.  I didn't – I don't see any need to use any force.
> Q.   Okay.  So the force that you did use was unreasonable, wasn't it?
> A.   By shooting him?
> Q.   Taking him down and then shooting him[?].
> A.   Taking him down I don't think was unreasonable.  He had, in our – to my knowledge, had fought an officer and fled the

---

[35] Plaintiffs do not rely on actual malice because they assert that there are genuine issues of material fact as to whether Griggs acted with specific intent to injure D.M.C.  For the reasons set forth above, the Court finds there is not a genuine issue regarding the accidental nature of the shooting.

> scene, I learned, being apprehended.  At that time he wasn't
> completely compliant with our command to get down on the
> ground.  He was kind of in the process.  He wasn't there yet
> when I decided to knock him over.  But shooting him was not.

(Griggs Dep. 207:7-208:5.)    Upon discovering that his gun had discharged,

Griggs said "Oh, God I shot him.  I AD'd," meaning that he had an accidental

discharge.   (Griggs Dep. 30:1-16, 231:4-12.)    The department audio tapes

captured Officer Griggs making multiple requests for an ambulance and

emergency EMS personnel in which he can be heard speaking to D.M.C. and

saying "please hang in there, I'm sorry, I'm so sorry, please hang in, stay with

me." (Griggs Dep. 231:4-233:25; Griggs Dep. Ex. 2, at 5.)  Moreover, Plaintiffs

state in their own presentation of the facts that "Griggs admits that he

accidentally pulled the trigger and shot D.M.C." (Pls.' SMF ¶ 22.)  Griggs admits

that there was no need to use deadly force under the circumstances of this case

(and he in fact did not intend to use deadly force).   Based on Griggs' own

admissions, there is no reason to question the truthfulness of his characterization

of the shooting as unintentional – i.e. not motivated by malice or planned.  *See*

*Luna v. Ridge*, 436 F. Supp. 2d 1163, 1166 (S.D. Cal. 2006) (finding evidence

supported conclusion that shooting was an actual accident based upon

investigators conclusion that an outside force interfered with normal functioning

of the gun and in light of the officer's stating "oh, shit" when he saw suspect was

wounded).

Accordingly, in light of this evidence the Court finds that no jury could reasonably conclude that Officer Griggs acted with malice or with the intent to injure D.M.C. when he pushed him to the ground to make the arrest or by accidentally shooting him in the back of the head.  Plaintiffs' Cross-Motion for Partial Summary Judgment [Doc. 73] on this basis is therefore **DENIED**.

### C.    Plaintiffs' *Monell* Claims Against Fulton County

The parties disagree whether there are genuine issues of material fact as to whether an official custom or policy of Fulton County, including the failure to train officers how to prevent accidental discharges, was a moving force behind the violation of D.M.C.'s constitutional rights.  As the Court previously found that Officer Griggs' actions did not amount to excessive force in violation of D.M.C.'s Fourth Amendment rights, Plaintiffs' claim against Fulton County cannot survive summary judgment.  *Best v. Cobb Cnty.,* 239 F. App'x 501, 504 (11th Cir. 2007) (concluding that there can be no municipal liability for failure to train without an underlying constitutional violation by the officer); *see also Rooney v. Watson*, 101 F.3d 1378, 1381 n. 2 (11th Cir. 1996) (stating that the plaintiffs' "failure to train" claim could not exist independent of an underlying constitutional violation); *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.").  "[A]n inquiry into a governmental entity's custom or policy is relevant only when a

constitutional deprivation has occurred." *Rooney*, 101 F.3d at 1381 (citing *Vineyard v. County of Murray*, 990 F.2d 1207, 1211 (11th Cir. 1993) (per curiam) ("Only when it is clear that a violation of specific rights has occurred can the question of § 1983 municipal liability for the injury arise."). Accordingly, the Court **GRANTS** Fulton County's Motion for Summary Judgment [Doc. 89] on Plaintiffs' *Monell* claims.

## IV.   CONCLUSION

For the above and foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Officer Griggs' Motion for Summary Judgment [Doc. 59], **GRANTS** Fulton County's Motion for Summary Judgment [Doc. 89], and **DENIES** Plaintiffs' Cross-Motion for Partial Summary Judgment [Doc. 73]. Defendant Griggs is entitled to summary judgment in his favor with respect to Plaintiffs' Fourth Amendment claim, but genuine issues of material fact as to whether Griggs is entitled to official immunity under Georgia law preclude summary judgment in his favor on Plaintiffs' negligence claim.

Despite the fact that all federal claims have now been dismissed, the Court exercises its discretion to retain supplemental jurisdiction over Plaintiffs' state law negligence claim pursuant to 28 U.S.C. § 1367. "The policy of supplemental jurisdiction is to support the conservation of judicial energy and avoid multiplicity in litigation. Having a state court rehash issues that have already been argued in federal court is [] likely to cause multiplicity in litigation." *Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 746 (11th Cir. 2006) (citing

*Rosado v. Wyman*, 397 U.S. 397, 405 (1970)).  In addition, the *Gibbs*[36] factor of "fairness to the parties" would not be served by dismissing the case and requiring Plaintiffs to start over in state court.  *Id.*

The parties are **DIRECTED** to engage in mediation within 45 days of this Order.  The case should be referred to the next available Magistrate Judge for mediation purposes.  The Consolidated Pretrial Order shall be filed within 30 days of the conclusion of mediation.

**IT IS SO ORDERED** this 24th day of September, 2013.


**Amy Totenberg**
**United States District Judge**

---

[36] *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966).